

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                 Civil Case No. 3:16-cv-127

C.T. WOODY, JR., SHERIFF, CITY
OF RICHMOND, in his official
Capacity, <u>et al.</u>,

        Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the UNITED STATES' MOTION FOR SUMMARY JUDGMENT ("U.S. Mot."), (ECF No. 29), as well as the DEFENDANT's MOTION FOR SUMMARY JUDGMENT ("Def. Mot."), (ECF No. 31). For the reasons set forth below, the United States' motion for summary judgment will be denied, and the defendant's motion for summary judgment will be granted.

### I. BACKGROUND

The United States filed this action on behalf of Emily Hall, a former employee of the Sheriff of the City of Richmond, Virginia, alleging violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.* (ADA or "the Act"). The remaining Defendant is Sheriff C.T. Woody, Jr.

("Woody"), appearing in his official capacity, as Sheriff of the City of Richmond.[1] The relevant facts are undisputed.

## A. Undisputed Facts

Hall began working as a Deputy Sheriff in 2003. (U.S. Mot. 3). In September 2012, Hall was diagnosed with familial dilated cardiomyopathy and supraventricular tachycardia, conditions that, without treatment, would substantially limit the operation of her cardiovascular system. Id. at 4. On September 21, 2012, Hall's doctors implanted an internal cardiac defibrillator and pacemaker to treat these conditions and to prevent heart failure. Id.

Hall's health condition and restrictions prevented her from performing the essential functions of her job as a Deputy Sheriff, namely that all Deputy Sheriffs must be able to have direct contact with inmates or other individuals. Id. at 5. Given her condition and this essential function, the parties agree that no accommodation could have enabled Hall to remain a Deputy Sheriff. Id.; see also Def. Mot. 27. Hall therefore required (and timely requested) reassignment to a vacant civilian position to remain employed by the Sheriff. (U.S. Mot. 5).

---

[1] The Complaint also named, as a defendant, "the Richmond City Sheriff's Office," a non-existant entity. By Memorandum Opinion and Order entered on May 2, 2016 (ECF Nos. 16, 17), the action was dismissed as to that entity.

In January of 2012, Hall was informed by Billie Windzor, then head of the Human Resources (HR) Department at the Sheriff's Office, that a Payroll Technician position had become vacant. Id. at 7. The parties agree that Hall possessed the minimum qualifications necessary for the position, and that reassignment to the job would have accommodated Hall's disability. Id.[2]

Eight other applications were submitted for the position of Payroll Technician. (U.S. Mot. 9). All of these applications, except for Hall's, were from candidates not then employed by the Sheriff. Id. Four applicants received interviews for the position, during which they were ranked according to their comparative qualifications under the department's own internal evaluation system. Id. Woody contends, and the U.S. does not dispute, that Hall was the least qualified interviewee under these metrics. (Woody Mot. 2; U.S. Resp. 1). Hall did not

---

[2] Although the parties initially disputed whether Hall was qualified for several other vacancies that arose during this time, the United States has since conceded that the only ADA claim presented by its complaint was Woody's decision not to reassign Hall to the vacant Payroll Technician position. Summ. J. Hr'g Tr. 34:19-35:5 (ECF No. 71). The United States initially maintained that the circumstances surrounding these vacancies were still relevant to whether Woody had consistently applied his hiring policy, but later conceded that it had not met its burden on the consistency issue. Id. at 90:14-91:5. The other vacancies discussed in the parties' briefs are therefore irrelevant to the issue presented on summary judgment.

receive the Payroll Technician position. Instead, the most qualified applicant was hired.

The parties agree that the Sheriff has and maintains an official, neutral, and non-discriminatory policy of hiring the "most qualified" candidate for each position or vacancy that arises. (Def. Mot. 4; U.S. Resp. 1) Woody contends that he has consistently followed this "most qualified" hiring policy in the past, and the United States has conceded that the record does not indicate otherwise. Summ. J. Hr'g Tr. 90:14-91:5.[3] Furthermore, the parties agree that Woody's "most qualified" hiring policy was followed with respect to the filling of the vacant Payroll Technician position in question. In other words, the parties agree that Hall was not reassigned to the Payroll Technician position because, notwithstanding her disability, she was not the most qualified applicant for the job. (Def. Mot. 2; U.S. Resp. 1). The issue presented in this case is whether that decision nonetheless violated the ADA.

## B. Procedural History

Sometime on or before October 10, 2013, Hall filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Woody discriminated against her

---

[3] From newspaper articles, the Court is aware that, in the past, Woody was criticized for hiring several relatives. There is, however, nothing in the record on that subject and nothing to indicate the qualifications of any relative that Woody may have hired.

in violation of the ADA by denying her a reasonable accommodation. (U.S. Mot. 12) Pursuant to 42 U.S.C. § 2000e-5, incorporated by reference in 42 U.S.C. § 12117(a), the EEOC investigated Hall's charge. Id. The EEOC found reasonable cause to believe that Woody had discriminated against Hall in violation of the ADA. Id. After the EEOC's conciliation efforts failed, the EEOC referred the matter to the United States Department of Justice. Id.

The United States filed the Complaint (ECF No. 1) in this case on March 2, 2016. Woody filed an Answer on May 16, 2016 (ECF No. 18). On September 2, 2016, the parties filed these cross-motions for summary judgment (ECF No. 29, ECF No. 31). The United States filed its response ("U.S. Resp.," ECF No. 35) on September 16, 2016, and Woody did the same ("Def. Resp.," ECF No. 36). Replies to the cross-motions were filed on September 22, 2016 (ECF No. 37, 38) ("U.S. Reply," "Def. Reply"), and oral argument was heard on October 18, 2016 (ECF No. 68). For the reasons stated on the record at that hearing, the Court ordered the trial in this case to be continued generally, pending resolution of the motions for summary judgment (ECF No. 67).

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) instructs that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When evaluating a motion for summary judgment under Rule 56, any disputed "facts must be viewed in the light most favorable to the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007). In general, the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Although the Court continues to endorse this general framework, it has also provided more specific instruction to courts assessing "reasonable accommodation" claims under the ADA.

In United States v. Barnett, the Supreme Court endorsed a two-step, burden-shifting framework for assessing claims arising under the "reasonable accommodation" provision of the ADA. 535 U.S. 391, 401 (2002). To survive summary judgment, the employee must first demonstrate that the accommodation he or she requests "seems reasonable on its face, i.e., ordinarily or in the run of cases." Id. If the plaintiff makes this showing, the employer "then must show special (typically case-specific) circumstances

6

that demonstrate undue hardship in the particular circumstances." Id. at 402.

If the accommodation requested by the employee is not reasonable in the run of cases, summary judgment for the employer will usually be appropriate. Id. at 403 ("The statute does not require proof on a case-by-case basis that a seniority system should prevail."). Nevertheless, even where the requested accommodation would be unreasonable in the run of cases, the plaintiff-employee "nonetheless remains free to show that special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts." Id. at 405. In Barnett, the Court further explained, in the context of the seniority system at issue, what a showing of "special circumstances" might entail:

> The plaintiff might show, for example, that the
> employer, having retained the right to change the
> seniority system unilaterally, exercises that right
> fairly frequently, reducing employee expectations that
> the system will be followed—to the point where one
> more departure, needed to accommodate an individual
> with a disability, will not likely make a difference.
> The plaintiff might show that the system already
> contains exceptions such that, in the circumstances,
> one further exception is unlikely to matter. We do not
> mean these examples to exhaust the kinds of showings
> that a plaintiff might make. But we do mean to say
> that the plaintiff must bear the burden of showing
> special circumstances that make an exception from the
> seniority system reasonable in the particular case.
> And to do so, the plaintiff must explain why, in the
> particular case, an exception to the employer's

> seniority policy can constitute a "reasonable accommodation" even though in the ordinary case it cannot.

Id. at 405-06. The United States concedes that it has not demonstrated "special circumstances" in this case, and therefore rests its summary judgment position only on the theory that reassignment would ordinarily be "reasonable" for employees like Hall, where the presence of a nondiscriminatory "most qualified" hiring policy would otherwise have resulted in the employer hiring a more qualified but non-disabled applicant. Summ. J. Hr'g Tr. 90:14-91:5.

### III. THE ADA

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). In passing the ADA, Congress expressly found that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(8).

To accomplish these goals, the ADA prohibits all "discrimination against a qualified individual on the basis of

disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act then details the different ways in which employers may violate this general prohibition against discrimination. Among other things, "discrimination" includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. 12112(b)(5)(A).

The phrases "reasonable accommodation" and "undue hardship" are further defined by the statute. Section 1211(9)(A)-(B) provide that "the term 'reasonable accommodation' may include":

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111 (9)(A)-(B)(emphasis added). The dispositive issue presented in this case is whether these statutory provisions mandate that, as an accommodation of last resort, employers must depart from their neutral and nondiscriminatory policy of hiring the most qualified candidate for a vacancy in order to reassign a minimally qualified disabled employee. In other words, this case requires the Court to determine whether the ADA required the Sheriff to reassign Hall to the Vacant Payroll Technician position, notwithstanding the fact that she was the least qualified person being considered for the position, simply because she had a disability. For the reasons outlined below, the Court concludes that it does not.

## IV. DISCUSSION

Because the Fourth Circuit has not squarely addressed the question in this case,[4] the Court approaches it as a matter of

---

[4] Woody argues that this case is controlled by Myers v. Hose, 50 F.3d 278 (4th Cir. 1995), in which the Fourth Circuit stated that "the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of his present position." Id. at 284. But, the Fourth Circuit has since distinguished that language as dicta "contrary to congressional direction and [] in no way required by our Myers decision." Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 350 (4th Cir. 1996). Reliance on Myers is thus inappropriate. The Court does take note of the Fourth Circuit's more recent instruction that "[t]he ADA does not require employers to penalize employees free from disability in order to vindicate the rights of disabled workers." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 355 (4th Cir. 2001). However, because this language is also dicta (and from a distinguishable context), the

statutory interpretation. And the "preeminent canon of statutory interpretation . . . presume[s] that the legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-254 (1992). Therefore, the "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004); see also Lamie v. United States Trustee, 540 U.S. 526, 534 (2004).

## A. The Text

A straightforward reading of the statute does not support the United States' position in this case. The ADA requires employers to provide "reasonable accommodations," unless doing so would cause an "undue burden." 42 U.S.C. 12112(b)(5)(A). And reasonable accommodations "may include," among other things, "reassignment to a vacant position." 42 U.S.C. 12111(9). Putting these provisions together, the plain meaning is clear but inconclusive: because "reasonable accommodations" are required, then, if reassignment is the only accommodation possible, it will be required *if it is "reasonable,"* unless it would constitute an "undue burden" for the employer. No further direction is given, however, as to *when* a given accommodation, including reassignment, would be "reasonable."

---

Court does not rely on Sarah Lee to resolve the present case. The Court reaches the same conclusion implied by Sarah Lee, but does so without giving it controlling weight.

11

Notwithstanding this lack of clear direction, the "findings and purpose" section of the ADA persuade the Court that Congress did not intend the ADA to operate as an affirmative action statute. In its express findings, Congress declared that "the Nation's proper goals regarding individuals with disabilities are to assure *equality of opportunity*," and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities *the opportunity to compete on an equal basis* and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 1201(a)(7)-(8) (emphasis added). These express findings certainly teach, if they do not conclusively prove, that Congress passed the ADA to eliminate barriers to *equal* opportunity facing disabled Americans, not to grant disabled employees a competitive edge. This conclusion is consistent with the express purpose of the act: "to provide a clear and comprehensive national mandate for the *elimination of discrimination* against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (emphasis added).

This equal-opportunity interpretation of the statute is further confirmed by the common sense principle of statutory construction that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouse holes." Whitman v. American Trucking Assns., Inc., 531 U.S. 457,

468 (2001); see also E.P.A. v. EME Homer City Generation, L.P., 134 S. Ct. 1584, 1612 (2014); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159-160, (2000); MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218, 231 (1994). This principle provides helpful guidance to the Court as it considers whether Congress has created an affirmative action regime for the disabled, and done so (as the United States argues) by including in the "definitions" section of the ADA that "reasonable accommodations may include," among other things, "reassignment to a vacant position." See 42 U.S.C. § 12111(9)(B) (internal quotations omitted).

Indeed, it would be quite surprising to learn that Congress had required employers to make hiring decisions exclusively based on disability in an act that affirmatively prohibits that conduct and that expressly aims to achieve only "equal opportunity." See 42 U.S.C. §§ 12101(a)(8), 12112(a). That type of statutory requirement, if enacted, might further be surprising given the far-reaching and counter-intuitive consequences it would cause for other protected classes within the workforce. For example, under the United States' interpretation, a twenty-five year old white male disabled employee who required reassignment would automatically get a position even over a more qualified sixty-five year old black female employee who lacked a disability. It strains plausibility

13

and the norms of statutory interpretation beyond recognition to conclude that Congress has made that far-reaching decision, and, moreover, that it has done so in the definitional section of a statutory provision describing what "reasonable accommodations" "*may* include." 42 U.S.C. § 12111(9)(B)(emphasis added).

The view of the United States to the contrary is based on arguments culled from decisions in the Tenth and D.C. Circuits. Relying on those decisions, the United States asserts that any superficial ambiguity in the statutory scheme can be resolved not by common sense or the express findings and purposes of the act, but by the interpretative canon against superfluity (or surplusage). (U.S. Mot. 17-18). Quoting the Tenth Circuit, the United States argues that failure to read the ADA as mandating reassignment in the circumstances of this case "renders the reassignment provision superfluous," id. at 17, because "if the reassignment language merely requires employers to consider on an equal basis with all other applicants an otherwise qualified existing employee with a disability for reassignment to a vacant position, that language would add nothing to the obligation not to discriminate, and would thereby be redundant." Smith v. Midland Brake, Inc., 180 F.3d 1154, 1164-65 (10th Cir. 1999).

That interpretation misapplies the canon against superfluity, a tool of construction that already has only limited utility.[5]

It is correct that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 556 U.S. 303, 314 (2009) (internal citation omitted). But, even assuming that the reassignment provision is ambiguous, (a necessary prerequisite for the canon to apply), it is also settled that "[l]anguage in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." United States v. Turkette, 452 U.S. 576, 583 n.5 (1981). This is especially relevant when interpreting "reassignment to a vacant position" under the ADA because the statute expressly provides only that it "*may*" be a "reasonable accommodation." 42 U.S.C. § 12111(9) (emphasis added).

---

[5] The Supreme Court has emphasized the limited value of this canon. See, e.g., Lockhart v. United States, 136 S. Ct. 958, 966 (2016) ("Our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage."); Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1177 (2013) ("The canon against surplusage is not an absolute rule."); Arlington Central School Dist. Bd. of Ed. v. Murphy, 548 U.S. 291, 299 n.1 (2006) ("While it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown."); Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253 ("Redundancies across statutes are not unusual events in drafting....").

Contrary to the position of the United States and the decisions on which it relies, interpreting reassignment under the ADA as something less than "always mandatory" does not render it redundant with the obligation not to discriminate. Absent the ADA's reassignment language, an employer would be free to terminate a disabled employee who cannot be reasonably accommodated in his or her current position. But, because of the reassignment language, employers may not fire such a person without first seeking to place the employee in a vacant position for which he or she is qualified. Furthermore, if no circumstances exist that make a potential reassignment *unreasonable*, then reassignment will be required of the employer. Notwithstanding the views of the DC and Tenth Circuits, nothing about this interpretation renders the reassignment provision "redundant." To the contrary, this is the only reading of the statute that gives effect to every term.[6]

The United States also cites to the D.C. Circuit for the argument that, by definition, reassignment "must mean more than allowing an employee to apply for a job on the same basis as anyone else . . . the core word 'assign' implies some active effort on the part of the employer." Aka v. Wash. Hosp. Ctr.,

---

[6] By contrast, the extreme view offered by the United States (that reassignment is always required as an accommodation of last resort) reads the words "may" and "reasonable" out of the statute. Similarly, the view that reassignment is never mandatory makes the same mistake.

156 F.3d 1284, 1304 (D.C. Cir. 1998); see also U.S. Mot. 19-21. This argument too is unpersuasive.

To begin, the argument is based on the strawman that mere consideration of an employee for a vacancy is somehow an accommodation. However, neither the D.C. Circuit nor the United States has identified any entity that has advanced such an argument or any decision holding that "considering" an employee for a vacancy satisfies the ADA in the sense that "consideration" somehow "accommodates" the employee's disability. Nor has any court suggested that, by "considering" an employee for a vacancy, the employer has somehow "reassigned" them. Thus, the argument posits no circumstance that its central premise needs to address.

Moreover, the argument fundamentally misapprehends the statutory scheme. The inclusion of reassignment on the list of possible reasonable accommodations simply obliges employers to consider whether reassignment of the disabled employee, as an accommodation of last resort, would be "reasonable," and therefore required. See Barnett, 535 U.S. at 401. When reassignment would not be reasonable, i.e. because it would require deviation from a well-established seniority system, employers do not violate the ADA by failing to provide it. Id. The reason why, importantly, is not that the employer has somehow provided a "reasonable accommodation" by merely

17

considering the disabled employee for a vacancy, but rather that, after considering reassignment, the employer correctly determined that <u>no</u> reasonable accommodation was possible.

The United States' interpretation of the reassignment provision, which mirrors the EEOC's guidance on the subject,[7] precludes even that possibility. It claims instead that "[t]he plain language of the statute requires an employer to reassign a qualified employee with a disability to a vacant position when reassignment is a necessary accommodation." (U.S. Mot. 3). As has already been explained, this absolute view of the statute is untenable because it substitutes (literally) the word "necessary" for the statutory word "reasonable," and it is firmly foreclosed by <u>Barnett</u>, where the Supreme Court rejected any reading of "reasonable accommodation" that equated "reasonable" with "effective." <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391, 399-400 (2002) ("[I]n ordinary English the word 'reasonable' does not mean 'effective' . . . a demand for an

---

[7] The EEOC's interpretive guidance provide that reassignment "*must be provided* to an employee who, because of a disability, can no longer perform the essential functions of his/her current position." EEOC, No. 915.002, <u>Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act</u> (2002) (emphasis in original). The guidance specifies that "[t]he employee does not need to be the best qualified individual for the position in order to obtain it as a reassignment." <u>Id</u>. The Court holds, and the United States agrees (<u>see</u> Summ. J. Tr. 5:13-14), that this interpretation of the ADA is entitled only to <u>Skidmore</u> deference. <u>See</u> <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944).

effective accommodation could prove *unreasonable* because of its impact . . .")(emphasis added). In other words, the Supreme Court confirmed in <u>Barnett</u> that the plain meaning of the reasonable accommodation provision umambiguously precludes the aggressive interpretation of the ADA advocated by the United States and the EEOC.[8]

Reassignment to a vacancy is not always mandated by the ADA, even as an accommodation of last resort. And while the United States contends that reassignment would generally be reasonable in cases like this one, even this more moderate interpretation runs counter to the clear equal-opportunity purpose of the ADA. Nevertheless, in light of the split of judicial authority on this issue, the Court assumes *arguendo* that at least some ambiguity in the statutory scheme remains. To resolve that ambiguity, it is appropriate to "look[] to other indicia of congressional intent such as the legislative history to interpret the statute. <u>Lee v. Norfolk S. Ry. Co.</u>, 802 F.3d 626 (4th Cir. 2015).

---

[8] The Court therefore holds that the EEOC's guidance lacks the "power to persuade." <u>See</u> <u>Skidmore</u>, 323 U.S. at 141. Furthermore, even if the more deferential <u>Chevron</u> standard applied, the EEOC's "always mandatory" interpretation would remain "manifestly contrary to the statute" (and <u>Barnett</u>), and therefore not entitled to deference. <u>See</u> <u>Chevron, U.S.A., Inc.</u> <u>v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 844 (1984).

## B. Legislative History

To the extent that the legislative history of the ADA can shed light on Congressional intent, it only confirms what the text already teaches: that the ADA does not require employers to give preferences in hiring to disabled persons, thereby discriminating against those without a disability.

The most cited and relevant legislative history of the ADA comes from the committee report of the House Committee on Education and Labor, which reported out the bill that became the ADA. Although that report addressed the "reasonable accommodations" provision only briefly, it went into much greater detail in its explanation of "discrimination against a qualified individual with a disability." The report explained:

> By including the phrase "qualified individual with a disability," the Committee intends to reaffirm that this legislation *does not undermine an employer's ability to choose and maintain qualified workers*. This legislation simply provides that employment decisions must not have the purpose or effect of subjecting a qualified individual with a disability to discrimination on the basis of his or her disability.
>
> *Thus, under this legislation an employer is still free to select applicants for reasons unrelated to the existence or consequence of a disability.* For example, suppose an employer has an opening for a typist and two persons apply for the job, one being an individual with a disability who types 50 words per minute and the other being an individual without a disability who types 75 words per minute. The employer is permitted to choose the applicant with the higher typing speed, if typing speed is necessary for successful performance on the job.

On the other hand, if the two applicants are an individual with a hearing impairment who requires a telephone headset with an amplifier and an individual without a disability, both of whom have the same typing speed, the employer is not permitted to choose the individual without a disability because of the need to provide the needed reasonable accommodation to the person with the disability.

In the above example, the employer would be permitted to reject the applicant with a disability and choose the other applicant for reasons not related to the disability or to the accommodation or otherwise not prohibited by this legislation. *In other words, the employer's obligation is to consider applicants and make decisions without regard to an individual's disability, or the individual's need for a reasonable accommodation. But, the employer has no obligation under this legislation to prefer applicants with disabilities over other applicants on the basis of disability.*

H.R. REP. 101-485, 55-56, 1990 U.S.C.C.A.N. 303, 337-38 (emphasis added).

Although some of this guidance might conceivably only apply to outside applicants rather than employees seeking reassignment, the language of the report is not so limited. To the extent that legislative history has interpretive value, the Court finds that it also contradicts the interpretation of the United States.[9]

---

[9] Neither the Tenth nor D.C. Circuit addressed this part of the legislative history, notwithstanding that both courts referenced to, and relied on, the same committee report elsewhere in their opinions. See Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1162 (10th Cir. 1999); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998).

Notwithstanding the plain text, purpose, and legislative history of the ADA, the United States contends that the Supreme Court's decision in Barnett compels its interpretation in this case, and cites heavily to the Seventh Circuit's decision in E.E.O.C. v. United Airlines, Inc., 693 F.3d 760 (7th Cir. 2012), for that proposition. (U.S. Mot. 24-29, U.S. Resp. 8-12, U.S. Reply 6). Because the Court believes that the Seventh Circuit's original and more thorough decision in E.E.O.C. v. Humiston-Keeling, Inc., 227 F.3d 1024 (7th Cir. 2000) overruled by United Airlines, reached the proper interpretation of the ADA, it addresses the position outlined by the Seventh Circuit in the subsequent United Airlines decision (and the United States in its motion for summary judgment) analyzing Barnett.

## C. **US Airways, Inc. v. Barnett**, 535 U.S. 391 (2002)

In Barnett, the Supreme Court rejected the argument that the "reassignment" obligation imposed by the ADA required employers to deviate from an established, non-discriminatory seniority system. In answering "no" to that question, however, the Supreme Court commented somewhat broadly on the topic of "preferences," and the United States now relies heavily on that comment. Responding to the broad argument that the ADA never "require[s] the employer to grant a request that, in violating a disability-neutral rule, would provide a preference," id. at 397, the majority countered:

22

> While linguistically logical, this argument fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the <u>same</u> workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective. . . . The simple fact that an accommodation would provide a "preference"—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, <u>in and of itself</u>, automatically show that the accommodation is not "reasonable."

<u>Id.</u> at 397-98 (emphases in original); <u>see also</u> U.S. Mot. 25.

On the basis of this language alone and without further analysis of the statute, the Seventh Circuit reversed its prior decision in <u>Humiston-Keeling</u>. <u>See</u> <u>E.E.O.C. v. United Airlines, Inc.</u>, 693 F.3d 760, 761 (7th Cir. 2012) ("While we understand that this may be a close question, we now make clear that <u>Humiston-Keeling</u> did not survive <u>Barnett</u>."). In doing so, the Seventh Circuit adopted the interpretation of the ADA it had previously characterized as "affirmative action with a vengeance." 227 F.3d at 1029. The United States argues that this Court must do the same. (U.S. Mot. 27-28).

The United States also notes the Supreme Court's statement in Barnett that "[w]e also assume that normally such a request would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system." Id. at 402; see also United Airlines, 693 F.3d at 764, n.3. The United States seemingly reads this language to mean that seniority systems are the only exception to an otherwise categorical rule mandating reassignment, a position that it supports by pointing to the Supreme Court's focus on the "employee expectations" inherent in a seniority system. See Summ. J. Hr'g Tr. 12:24-13:25.

These arguments misunderstand and misapply the Supreme Court's guidance in Barnett. Relying on the Seventh Circuit, the United States emphasizes the Supreme Court's instruction that "preferences will sometimes prove necessary" under the Act. But like the Seventh Circuit, the United States ignores the clause that immediately follows and explains when preferences may prove necessary: "to achieve the Act's basic equal opportunity goal." See U.S. Resp. at 12 (selectively quoting Barnett). The United States, like the Seventh Circuit, also ignores, as Woody correctly points out, the very next sentence in the Court's opinion, which explains that these "preferences" must come "in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the same workplace

24

opportunities that those without disabilities automatically enjoy." Barnett, 535 U.S. at 397 (emphasis in original); see also Def. Reply at 8. This language unambiguously provides that the preferences necessary under the act are only those required to level the playing field for disabled employees, nothing more. The Court therefore finds that United Airlines lacks persuasive value.

Consistent with the Supreme Court's guidance in Barnett, the Court holds here that the ADA does not require minimally qualified disabled employees to be granted special preferences in hiring over non-disabled applicants. See also Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 483 (8th Cir. 2007) (holding the same); Daugherty v. City Of El Paso, 56 F.3D 695 (5th Cir. 1995) (holding the same); EEOC v. Sara Lee Corp., 237 F.3d 349 (4th Cir. 2001) (implying the same conclusion in dicta). Where an employer maintains a non-discriminatory policy of hiring the most qualified candidate, it would not ordinarily be reasonable (in the run of cases) to require deviation from that policy in order to accommodate a minimally but lesser qualified disabled applicant. This interpretation of the statute is the only one consistent with the plain text and clear purpose of the ADA, and it is "bolstered," not undercut, by the Supreme Court's analysis in Barnett. See Huber, 486 F.3d at 493. Therefore summary

judgment for the United States will be denied, and summary judgment for Woody will be granted.

The Court notes that, under the Barnett framework, the United States was still free to show "special circumstances" suggesting that reassignment would nonetheless have been reasonable for Hall, including evidence that Woody has not consistently applied his "most qualified" hiring policy in the past. See Barnett (holding that "fairly frequent" deviation from a seniority system could rebut the conclusion that reassignment in violation of it was unreasonable).[10] At the very least, dispute over the consistency in application of a non-discriminatory hiring policy could conceivably have formed the basis for a denial of Woody's motion for summary judgment. Nevertheless, although there was some initial dispute on this point, see U.S. Resp. 12-13 and U.S. Reply at 4-5 (alleging past deviation from Woody's "most qualified" policy), the United States conceded at oral argument that it has not presented sufficient evidence that any "special circumstances" exist in this case. See Summ. J. Hr'g Tr. 90:14-91:13, ECF No. 71 ("The record does not have sufficient evidence one way or the other on

---

[10] This caveat from Barnett makes sense. Evidence that a policy has been routinely ignored in hiring decisions raises the danger that the policy is currently being used pretextually to prevent an otherwise qualified disabled person from obtaining the position. In such circumstances, rather than require employees or employers to litigate the mental process behind a hiring decision, the ADA may well require reassignment.

that issue to try that issue.") Summary judgment for Woody will therefore be granted.

### V. CONCLUSION

For the reasons outlined above, the United States' Motion for Summary Judgment (ECF No. 29) will be denied, the Defendant's Motion for Summary Judgment (ECF No. 31) will be granted, and this action will be dismissed with prejudice.

It is so ORDERED.

_____/s/_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  November 22, 2016

27